Milton M. THOMSON, Appellant,

v.

The KANSAS CITY STAR COMPANY, a Corporation, Respondent.

No. 50476.

Supreme Court of Missouri,

Division No. 1.

March 8, 1965.

Ray D. Jones, Jr., Kansas City, for plaintiff-appellant.

Douglas Stripp, Allan L. Bioff, Kansas City, Watson, Ess, Marshall & Enggas, Kansas City, of counsel, for respondent.

HIGGINS, Commissioner.

Action for $25,000 actual and $100,000 punitive damages for libel. The trial court

dismissed plaintiff's petition for failure to state a claim, and plaintiff has appealed.

Plaintiff's petition relates to an article in The Kansas City Times (The Morning Kansas City Star) July 30, 1960. The article, with letter designations and emphasis on specific portions mentioned in subparagraphs A through E, paragraph 3, and in paragraph 5 of the petition, follows:

A. "MONEY FLOWS INTO PRIMARIES

"Johnson County is Witnessing New Approach in Campaign by Democrats

"HOT RACE FOR SHERIFF

B. "Some Party Members Show Concern Over Source of Funds

By Dick Nichols
(A Member of The Star's Staff)

"Soaring registration and intense activity clear down to the precinct level give indications of one of the liveliest primary elections in years in Johnson County.

"With the campaigns winding up this weekend for all practical purposes, the voters have a brief opportunity to reflect on their choices to represent the party tickets.

"Plenty of Democrats.

"For legislative and county offices, the Democrats give the widest choice with six races among 13 candidates. The G.O.P. has contests in only four offices.

"A new element has been injected into the Democratic primary. *Where in past years money has been in particularly short supply,* C. *a few candidates have come out with campaigns that provide signs of well-heeled backing with* (all) *the trimmings.*

"*The 3-man race for the sheriff nomination has served as a prime example of the effect of money.* In that one, Milton M. Thomson, a private detective who was defeated in the 1958 general election, has plastered the county with his signs.

"The personable Thomson within the year *has passed more or less unmarked through two brushes with the law.* He is opposed by the Merriam chief of police, Jack Dodson, and Bob Stewart of Overland Park, who is employed privately in police work also.

"Many Signs Up.

"*Many party organization Democrats have expressed concern over Thomson's candidacy and the source of his campaign funds. An* D. *opposition party candidate estimated that 2,000 reflector-type signs for Thomson, costing about 50 cents each, had been put up.*

"*Johnson County Democrats long have feared encroachments by* E. *their more powerful colleagues in Kansas City and Jackson County. Even ministers in the suburban territory have expressed their concern in recent sermons.*

"Political observers in Johnson County believe that both parties will gather record vote totals in the primary. Estimates that the combined total will exceed 35,000 have not been ruled out of line.

"A traditional split would give the Republicans 20,000 total votes and the Democrats 15,000. Normally things are somewhat closer in the general election.

### "Senate Race is Hot.

"Hottest race going in the county on the G.O.P. side is between two lawyers, seeking the office of state senator. In that one Clark Kuppinger, who served five terms as the sole member of the House from Johnson County, is opposed by Wayne Zeigler, young Roeland Park city attorney.

"Kuppinger, whose home is in Prairie Village, has his long record going for him, but Zeigler has waged the more intensive campaign.

"Another G.O.P. battle that bears watching is between Herbert W. Walton, an assistant county attorney, and Warren C. Neal, lawyer, for the probate judge nomination. The Republicans also provide a repeat of the 1958 primary in the contest between Mrs. Louise Hale and William A. Baker for the assessor nomination.

"Mrs. Hale won the first round two years ago, but lost to Thomas R. Martindale, Democrat, in the general election. He is running again. Martindale is unopposed.

### "Two from Olathe.

"The Democrats also have a race for state senator in which an Olathe lawyer, Lawrence Loftus, is running against a businessman there, William O. Turner.

"In another area, Commissioner Harry King, jr., is seeking the Democratic mantle for a second term, opposed by Kenneth Heard, a Shawnee city councilman who operates real estate and professional bonding agencies.

"Two women hold the spotlight in one Republican battle. Mrs. Betty West, clerk of the district court, is opposed for the nomination by Mrs. Marie Murphy from Prairie Village."

———◆———

Among other things plaintiff alleged that "defendant maliciously and without just cause or excuse liabled (sic) plaintiff by publishing and circulating over 300,000 copies of a false and malicious article about plaintiff's candidacy which imputed a criminal act to plaintiff and the false reported facts and malicious comment about plaintiff tended to expose plaintiff to public contempt and to deprive him of public confidence * * *"; that the article is false and untrue in the following particulars (Set forth here are items A through E and 5 above, together with complaints respecting each item which will be considered later); that the article imputes to plaintiff a violation of the Kansas statute governing the amount a candidate may spend; that the "article improperly comments plaintiff 'has passed more or less unmarked through two brushes with the law' without stating the entire facts relating to plaintiff's court proceedings and said article is intended to create the impression that plaintiff is a law vio-

lator who somehow escaped conviction and therefore * * * tends * * * to injure plaintiff in his campaign for sheriff"; that "Plaintiff was liabeled (sic) and said liable (sic) tended to disparge (sic) and injure plaintiff in his business as a private detective, as a candidate for public office * * * and * * * tended to expose plaintiff to public hatred, contempt and ridicule, and to deprive him of the benefits of public confidence and social intercourse, and * * * tended to blacken his reputation as a man capable of law enforcement free of political influence, and * * * imputed crime and unsavory political dealings and connections thereby, * * *."

Plaintiff has limited his appeal to a single issue, stating that "The question for determination is whether or not the publication was libelous on its face." He contends "the following false statements, Ministers Show Concern; Money Flows Into Primary; Party Leaders Show Concern over Thomson candidacy and the source of his campaign funds and other statements conveyed the idea to the reader that plaintiffs character was questioned by moral and political leaders, therefore the article was libelous per se on its face * * * by reason this article tended to expose him to public hatred, contempt, or ridicule and tended to deprive him of the benefits of public confidence."

In this situation we must determine if the published words constitute libel per se. This function was stated in Langworthy v. Pulitzer Publishing Co., Mo., 368 S.W.2d 385, 388 [5, 6]: " 'In determining whether language is libelous per se, it must be viewed stripped of any pleaded innuendo. The meaning of the phrase "per se" is "taken alone, in itself, by itself." Words which are libelous per se do not need an innuendo, and, conversely, words which need an innuendo are not libelous per se.' Shaw Cleaners & Dyers, Inc. v. Des Moines Dress Club, 215 Iowa 1130, 245 N.W. 231, 86 A.L. R. 839. The motion to dismiss * * * does not admit the construction of the words pleaded in an innuendo, Fritschle v. Kettle

River Co., 346 Mo. 196, 139 S.W.2d 948; Hylsky v. Globe Democrat Pub. Co., 348 Mo. 83, 152 S.W.2d 119, and whether the alleged libelous words, when given their natural meaning, Bernhardt v. Armbruster, Mo.App., 217 S.W.2d 759; Lightfoot v. Jennings, 363 Mo. 878, 254 S.W.2d 596, are 'capable of the defamatory meaning ascribed to them' is a question of law for the court to decide on a motion to dismiss. Cook v. Pulitzer Pub. Co., 241 Mo. 326, 145 S.W. 480, 485."

Section 559.410 RSMo 1959, V.A. M.S., defines libel: "A libel is the malicious defamation of a person made public by any printing, writing, sign, picture, representation or effigy tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse, * * *." Any language which, reasonably construed, comes fairly within the statutory language is libelous per se,. Seested v. Post Printing & Pub. Co., 326 Mo. 559, 31 S.W.2d 1045, 1052 [4–7]; Moritz v. Kansas City Star, 364 Mo. 32, 258 S.W.2d 583, 588 [8]; Coots v. Payton, 365 Mo. 180, 280 S.W.2d 47, 53 [11, 12]; however, the allegedly libelous language must be defamatory in its nature in order to support an action for defamation, and if a publication cannot reasonably bear a defamatory meaning, it cannot be the basis for an action for libel. Diener v. Star-Chronicle Pub. Co., 230 Mo. 613, 132 S.W. 1143, 33 L.R.A.,N.S., 216; Hylsky v. Globe Democrat Pub. Co., 348 Mo. 83, 152 S.W.2d 119; Julian v. Kansas City Star Co., 209 Mo. 35,. 107 S.W. 496; Walsh v. Pulitzer Pub. Co.,. 250 Mo. 142, 157 S.W. 326; Creekmore v. Runnels, 359 Mo. 1020, 224 S.W.2d 1007.

The application of the statute is illustrated by the second case of Diener v. Star-Chronicle Pub. Co., 230 Mo. 613, 135 S.W. 6, 11: "(I)t is argued that the tendency of the publication was to expose plaintiff to 'public hatred, contempt, or ridicule, or to deprive him of the benefits of public confidence and social intercourse,' * * *. But he who

thinks that an article merely having that tendency is either a civil or a criminal libel has studied the law of libel to little purpose. The controlling words * * * are 'malicious defamation' by means of printing and writing, etc., tending to provoke him to wrath or expose him, etc. There must be defamation in a libelous sense before there can be a libel. * * * To make a libel there must be defamation in the sense of the law, before the public scorn and contempt feature is operative. Defamation includes the idea of calumny, aspersion by lying; the injury of another's reputation in that way. To defame is to speak evil of one maliciously, to dishonor, to render infamous." This application was amplified in Coots v. Payton, supra, 280 S.W.2d 1. c. 53 [14]: "' * * * the defamatory words must be of such a nature that the court can presume as a matter of law that they will tend to disgrace and degrade the person *or* hold him up to public hatred, contempt, or ridicule or cause him to be shunned and avoided; * * * they must reflect *on his integrity, his character, and his good name and standing* in the community, *and* tend to expose him to public hatred, contempt, or disgrace. * * * It is not sufficient, standing alone, that the language is unpleasant and annoys or irks plaintiff * * *.' "

We turn now to the parts of the article alleged to be libelous which we have previously designated and emphasized for ready reference. Plaintiff charged that item A was false and untrue in that plaintiff received approximately $45 from local political amateurs; that B was false and misleading in that no one showed a concern over a source of funds, and that such subheadline was inserted for the purpose of connecting plaintiff to improper sources of funds connected with trickery and deceit; that C was false in that his campaign was not well-heeled, his entire financing being approximately $45; that D is false because his signs cost but eight cents apiece; that if the statement were true, he would be guilty of violating criminal statutes, and that no Democrat expressed concern; that

E is false because no ministers have expressed concern, and that the article imputes a connection between plaintiff and a powerful political party; that 5 fails to state the entire facts relating to plaintiff's court proceedings and creates an impression that plaintiff is a law violator who escaped conviction.

These constructions, whether of the article in entirety or of its parts out of context, are forced and strained, a vice in which we shall not engage. Diener v. Star-Chronicle Pub. Co., supra, 132 S.W. 1. c. 1148. We cannot infer criminal activity by plaintiff, nor can we connect him with sources involved in trickery and deceit from the headline (A) or from any of the recitals such as C which suggest that plaintiff has financial backing. Neither does the subheadline (B) or the concern of Democrats or ministers as recited in items D and E lead to an inference that plaintiff's character was questioned, or to any inference suggested by plaintiff. The article itself answers the matters of "concern" when it states plainly in E that the fear or concern of Johnson County Democrats is that of encroachment by powers in Kansas City and Jackson County, Missouri, and it is this same fear of intrusion into local affairs by interests in the neighboring large city which is attributed to ministers. We can find no defamation in such statements. Even if they can be said to imply support or financing by Democrats in Kansas City, Missouri, such statements are free of defamation because there is nothing unlawful, improper or immoral on the face of such assistance. For the same reason, plaintiff could not be libeled if it be said that the article imputes connection with a powerful political party (E). Such would more likely be a desirable situation if the candidate hoped to attract support from his political party.

We find nothing in the article which imputes political support to plaintiff by persons of ill repute. If such a strained construction be possible, we have held in Walsh v. Pulitzer Pub. Co., supra, that a newspaper's statements, "'(H)is sponsors and his as-

sociates are survivors of the most degraded régime that St. Louis ever knew,'" and "'(h)e can have no proper motive in aspiring to the place,'" were not libelous of a lawyer seeking to become circuit attorney. The court said that "Something more than the mere general allegation as to the character of plaintiff's sponsors and his association with such characters as are designated is necessary to impute a crime to the plaintiff (citing cases), and that he 'can have no proper motive in aspiring to the place' is not a charge against his character or a reflection on his reputation, but a mere matter of opinion of which the voters are to be the judges." 157 S.W. 329 [6, 7].

Plaintiff's charge that the article imputes a violation of Kansas law also does not stand the test of libel per se. There is nothing in the recital (D) that an opposition party candidate estimated that 2,000 signs costing about 50 cents each had been put up, that is libelous or defamatory on its face. Plaintiff seeks to aid this allegation by pleading extrinsic facts to the effect that the law limits a candidate to an expenditure of ten per cent of the first year's salary of $8,900, and an expenditure of $1,000, therefore, would be in violation of the law. The article does not say that Thomson himself spent any money, and he complains elsewhere that the article implies that his backing comes from sources other than himself. To find this language defamatory would call for another forced and strained inference to be placed on otherwise innocuous language plus a resort to inconsistent innuendo.

■ The statement (5) to the effect that plaintiff has passed unmarked through two brushes with the law is not charged to be false, plaintiff's only complaint being that the article failed to state "the entire facts relating to plaintiff's court proceedings." Such complaint thus admits the existence of court proceedings and no authority need be cited for the proposition that truth is a defense to alleged defamation. Plaintiff would again construe a statement as libelous by a forced and strained suggestion that the recital leads to an inference that he is a "law violator" who "escaped conviction." We cannot reach that result because one who passes unmarked through legal proceedings and thereby remains free of conviction, normally does so because he is not a law violator. .

Plaintiff contends that he is supported by (1) Moritz v. Kansas City Star, supra, (2) Meriweather v. Publishers: George Knapp & Co., 120 Mo.App. 354, 97 S.W. 257, and (3) Lightfoot v. Jennings, 363 Mo. 878, 254 S.W.2d 596. Those cases are readily distinguished, however, because on their own facts, they held: (1) that it was libelous per se to charge an attorney with soliciting business, a charge of unprofessional conduct; (2) that a question was raised for the jury when a publication charged plaintiff with associating with or being like another person who had already been established as a vile, dishonest, corrupt, and criminal defendant; and (3) that imputation of political principles such as communism, objectionable to the average person in a community, is defamatory and actionable per se.

■ We have interpreted the article in the present case from its four corners and, giving the article its ordinary meaning in the plain and popular sense and construing the words fairly by their natural import, Jacobs v. Transcontinental & Western Air, 358 Mo. 674, 216 S.W.2d 523, 525 [4], we agree with the trial court that the article and its words do not constitute a libel actionable per se within the meaning of the tests here cited.

Defendant has briefed the defense of privilege also, but, having reached this

result, we need not extend our opinion to cover that subject.

The petition was properly dismissed, and the judgment of dismissal is affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All concur.